THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CLAYTON JORDAN, Defendant-Appellant.

Second District   No. 2—88—1207

Opinion filed November 6, 1990.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant, Clayton Jordan, was charged by indictment with murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(1)), aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(2)), intimidation (Ill. Rev. Stat. 1987, ch. 38, par. 12—6(a)(1)), and concealment of a homicidal death (Ill. Rev. Stat. 1987, ch. 38, par. 9—3.1). Following a jury trial, defendant was found guilty of each offense and was sentenced to an extended term of 80 years' imprisonment for murder, 30 years for aggravated criminal sexual assault, and five years each for intimidation and concealment of a homicidal death, with each sentence to run concurrent to the murder sentence. Defendant filed a timely notice of appeal.

On appeal, defendant contends that his convictions should be reversed and a new trial ordered because of the trial court's ruling denying his motion *in limine*. The motion *in limine* attempted to prevent the State from informing the jury that one of its witnesses, Brian Telander, was currently employed as an associate circuit court judge. Defendant argues that the State improperly bolstered Telander's credibility by continually referring to him as "judge" during the direct examination and closing arguments. For the reasons

stated below, we affirm.

Prior to trial, defendant's motion *in limine* attempted to pre-vent the State from informing the jury that Brian Telander was cur-rently employed as a judge. In denying the motion, the trial court ruled that the jury could be informed as to Telander's current occu-pation, but cautioned the State not to "refer to him as Judge Telan-der in any manner or fashion."

The following facts can be summarized from the lengthy record on appeal. Cornell Finley, an 11-year-old boy, testified that he was a friend of the victim in this case, 11-year-old Taneka Jones. Cornell stated that on January 9, 1988, Taneka came over to the Finley apartment in Hinsdale around 6 p.m. and stayed with Cornell while both of their mothers went to Chicago. Shortly thereafter, defendant came to the apartment and Taneka let him in. Cornell and Taneka knew defendant because he lived in the same apartment complex as they did. Defendant played a video game with Taneka and then left the apartment, returning a short time later to get keys to his apart-ment. After receiving the keys, defendant again left the apartment. Cornell indicated that John Kines then came to the apartment, with defendant arriving shortly thereafter. Defendant talked to Kines and then left the apartment. Cornell stated that Kines then went into his mother's bedroom, and Cornell fell asleep on the sofa in the liv-ing room.

Cornell woke up later that night and saw defendant drag Taneka out of the living room and into his mother's bedroom. Cornell heard a bed squeaking and Taneka saying "Stop. That hurts." Cornell went to his mother's bedroom, looked inside, and saw Taneka on the bed with defendant on top of her "[m]oving up and down." Cornell went back to the living room, but returned to his mother's bedroom when the noise stopped. At this time, Cornell saw Taneka lying on the floor with a blanket wrapped around her. He also saw Kines "tightening something on her neck." Defendant, Kines, and Saul Berry then took Taneka out of the apartment and down into the basement of the building.

Cornell indicated that he followed the men into a storage area in the basement. He saw the three men standing in the basement but could only see Taneka's feet. Both Kines and Berry were laughing, and defendant was masturbating. Cornell returned to his apartment, and the three men arrived a short time later. All three men told Cornell that the same thing would happen to him and his mother if he said anything.

The following morning, Cornell's and Taneka's mothers returned

to the apartment and began to search for Taneka. Shortly thereafter, Taneka's body was found, and the police were called. Cornell stated that he did not tell anyone what happened to Taneka because he was scared. It was not until six days after Taneka's murder that Cornell was able to tell the police what happened that night. Cornell also stated that he lied to Kines' attorneys a few months later because "they was there to get [Kines] out of jail."

Dr. Larry Blum, a forensic pathologist, testified that he performed an autopsy on Taneka Jones. It was his opinion that the cause of Taneka's death was ligature strangulation. He noted that death by ligature strangulation occurs when the blood flow to the brain ceases. In Taneka's case, he observed an abrasion one-half inch wide which went completely around her neck. A portion of Taneka's blouse, which was knotted in the front and "drawn up tight to the front of the neck," caused the abrasion.

Detective Warren Wilkosz of the Du Page County sheriff's department testified that he interviewed defendant on the day following the homicide. Initially, defendant stated that he was alone in his apartment for the entire previous night. Detective Wilkosz then read defendant his *Miranda* rights and informed defendant that he knew defendant was with Berry during the night. Defendant then stated that he was arrested that evening and was later released after posting a bond. Defendant admitted being in Cornell's apartment that night, but denied seeing Taneka or being in the basement storage area. Defendant then agreed to submit to hair, saliva and blood samples.

Brian Telander, an associate judge in Du Page County, testified that he was the chief of the criminal division of the Du Page County State's Attorney's office during the murder investigation. He indicated that he was informed of the homicide on January 10, 1988, and drove to the apartment complex in Hinsdale. Telander had conversations with several police officers and later saw Cornell, whom Telander described as nervous and afraid.

On January 13, 1988, Telander spoke to Cornell and learned that the crime may have occurred in Cornell's apartment. On January 15, 1988, Telander again spoke to Cornell at the State's Attorney's office. At this time, Cornell told Telander "what really happened," and search and arrest warrants were then issued. At approximately 11 p.m., defendant was placed under arrest. Around midnight, defendant was read his *Miranda* rights and indicated that he would speak to Telander. Defendant admitted that he had been in Cornell's apartment twice on the night in question, once to get his keys and

the other time to play a video game with Taneka. He denied being in the apartment at any other time that night.

Telander then told defendant that he was not "being truthful," and defendant asked if Berry and Hines had been arrested yet. Telander answered in the affirmative, and defendant indicated that he would tell "what really happened." Defendant then stated that he and Berry went to Cornell's apartment, where Kines greeted them. A short time later, defendant saw Kines grab Taneka and take her into the bedroom. Defendant held Taneka's head and Kines removed her clothing. Defendant stated that he then "had sex with her" while Kines and Berry held her down. The three men then agreed to kill Taneka to keep her from identifying them. Kines picked up a shirt and proceeded to strangle her. They then took her body into the basement storage area, and defendant proceeded to masturbate over her body.

Defendant then told Telander that the three men returned to the apartment and told Cornell that the same thing would happen to Cornell and his mother if he said anything about what happened. The three men then discussed the crime and prepared and practiced a story in case the police questioned them.

Telander stated that he had defendant again recite what transpired to make sure that Telander's notes were accurate. The notes were typed in memorandum form two days later.

On cross-examination, Telander indicated that he did not ask defendant to sign the typed memoranda. In addition, Telander did not ask defendant to write out his own version of the events on the night in question.

Following Telander's testimony, the State rested. Defendant's motion for a directed verdict was denied, and he did not present any evidence at trial. Following closing arguments, the jury, after lengthy deliberations, found defendant guilty of each offense charged. Defendant's motion for a new trial was denied, and he was sentenced to 80 years' imprisonment for murder, 30 years for aggravated criminal sexual assault, and 5 years each for intimidation and concealment of a homicidal death, with each sentence to run concurrently. This appeal followed.

On appeal, defendant contends that the trial court erred in denying his motion *in limine* seeking to prevent the State from informing the jury that Brian Telander was currently employed as a judge. Defendant argues that the only reason the State wanted to inform the jury as to Telander's occupation was to "qualify Telander as a sort of expert on credibility, coloring the jurors' perception both of

what Telander himself had to say and of what Cornell Finley and [defendant] supposedly admitted to him."

■ A motion *in limine* is addressed to the trial court's inherent power to admit or exclude evidence. (*People v. Escobar* (1988), 168 Ill. App. 3d 30, 43.) The court's decision to grant or deny the motion is within its discretion, and we will not reverse the decision on appeal absent a manifest abuse of this discretion. *Escobar*, 168 Ill. App. 3d at 43; *People v. Goka* (1983), 119 Ill. App. 3d 1024, 1029-30.

■ In the present case, we cannot say that the trial court manifestly abused its discretion in denying defendant's motion *in limine*. Certainly, the jury was entitled to know that Brian Telander was now employed as an associate judge in Du Page County. The reason for this is that the witness' occupation and related background is of value to the jury in determining the credibility of the witness and his testimony. (See *People v. Crane* (1922), 302 Ill. 217, 224-25; M. Graham, Cleary & Graham's Handbook of Illinois Evidence §607.6, at 335 (4th ed. 1984).) As such, the trial court properly ruled on defendant's motion *in limine* with respect to Telander's occupation as a judge.

We next consider defendant's contention that he was prejudiced by the cumulative effect of the State's repeated references to Brian Telander's position as an associate judge. Defendant argues that these references artificially bolstered Telander's credibility with the jury. In addition, defendant asserts that the references were improper given that the trial court, in denying defendant's motion *in limine*, instructed the State not to "refer to him as Judge Telander in any manner or fashion." Defendant correctly points out that the State, during direct examination, addressed Telander as "Judge Telander" a total of nine times. However, at no time did defendant object to the State's reference to the witness as "Judge Telander." In addition, defendant also brought out the fact that Telander was a judge on cross-examination, when the following colloquy occurred:

"Q. [Defense counsel] Well, you are a judge now?

A. [Brian Telander] And a lawyer.

Q. You are a lawyer, but you are still a judge?

A. I think I am both."

In support of his position, defendant cites to several cases in which a prosecutor testified as a witness. (See *People v. Janes* (1985), 138 Ill. App. 3d 558; *People v. Knox* (1967), 90 Ill. App. 2d 149; *People v. Nelson* (1967), 89 Ill. App. 2d 84.) In each of these cases, the assistant State's Attorney was actually prosecuting the

case in which he also testified as a witness. The *Janes* decision pointed out that courts are reluctant to allow a prosecutor to testify during the trial due to the possibility that the jury may place more weight on the prosecutor's testimony than on that of an ordinary witness. *Janes*, 138 Ill. App. 3d at 568.

Defendant concedes that Telander did not have a prosecutor's role in defendant's trial, but argues that the "prestige and prominence" of his position as an associate judge and his former position as chief of the criminal division of the State's Attorney's office artificially enhanced his credibility in the eyes of the jury. Defendant points out that the State referred to Telander's credibility several times during closing argument in order to greatly enhance the credibility of his testimony.

■■ ■ Initially, we note that a prosecutor is allowed a great deal of latitude in giving a closing argument. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175; *People v. Siefke* (1990), 195 Ill. App. 3d 135, 144.) In reviewing allegations of error during closing argument, we must closely examine the arguments of both the State and the defendant in their entirety to place the complained-of comments in their proper context. (*Siefke*, 195 Ill. App. 3d at 144.) However, it is generally improper for a prosecutor to express his personal belief in the credibility of the witnesses. (*People v. Rogers* (1988), 172 Ill. App. 3d 471, 476; *People v. Valdery* (1978), 65 Ill. App. 3d 375, 378.) In addition, courts have determined that a prosecutor should not insinuate that a particular witness is more believable than other witnesses simply due to the witness' occupation. See *Rogers*, 172 Ill. App. 3d at 476-77 (police officers); *People v. Ford* (1983), 113 Ill. App. 3d 659, 662 (same).

■ Examining the alleged improper comments during the prosecutor's closing and rebuttal arguments leads us to conclude that no error was committed in this case. Both the prosecutor and defense counsel referred to Brian Telander's testimony on numerous occasions during their closing arguments. On four occasions, the prosecutor referred to Telander's current position as a judge. While defendant did not object to any of these references, the court did, on one occasion, tell the prosecutor to "[a]rgue the evidence in this case." We have carefully reviewed these four references and conclude that it was not reversible error for the prosecutor to make these isolated references in this case. The jury was certainly well aware that Brian Telander was currently employed as a judge, especially given that both sides elicited this information during the direct and cross-examination of Telander.

■■ We have also reviewed defendant's contention that the prosecutor insinuated that Brian Telander was a more believable witness due to his positions as a prosecutor and judge and find it to be without merit. During closing argument, the prosecutor stated:

"We also have a confession that is taken by the Chief of the Criminal Division then—now judge Telander, who rose to the level—one of the top prosecutors in Cook County and then the top prosecutor in Du Page County 12 years as an attorney.

\* \* \*

[Defense] [c]ounsel's argument that this case hinges on the testimony of a single witness is nonsense. It does not. It is all of the evidence. His Honor will tell you that it is all of the evidence taken in combination. Look at all of the evidence. If this is the kind of a case where we have to rely on one single witness, I would like to have it rely on the testimony of Mr. Telander. That is outstanding, unrebutted evidence of the defendant's confession. I wish we had that kind of evidence in every criminal case that I try in these criminal courts."

Unlike the objectionable and erroneous comments in *Rogers* and *Ford*, these comments do not improperly bolster the credibility of Telander's testimony. Instead, these comments merely requested the jury to review all of the evidence in the case, including Telander's testimony, before reaching a verdict. It was also reasonable for the prosecutor to place a great deal of emphasis on Telander's testimony given the overall importance of this witness to the State's case.

For these reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

McLAREN and GEIGER, JJ., concur.